FILED

2008 Dec-15  PM 04:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MING WEI LIU,                    }
                                 }
        Plaintiff,               }
                                 }      CIVIL ACTION NO.
v.                               }      07-AR-0381-S
                                 }
BOARD OF TRUSTEES OF THE         }
UNIVERSITY OF ALABAMA, et        }
al.,                             }
                                 }
        Defendants.              }


## MEMORANDUM OPINION

Before the court are the motions of defendants, Dr. Robert C. Bourge ("Bourge") and the Board of Trustees of the University of Alabama ("Board"), for summary judgment seeking dismissal of the action of plaintiff, Dr. Ming Wei Liu ("Liu"). The Board is the governing authority for the University of Alabama at Birmingham ("UAB"). Also before the court is Liu's motion for partial summary judgment. In abbreviated form, Liu asserts that defendants deprived him of his substantive and procedural due process rights by invoking the Alabama peer review[1] privilege. Liu argues that, even if such privilege exists, it does not apply in federal court, and that for this reason UAB should be ordered to disseminate peer review materials to Liu's prospective employers. Without distinguishing between defendants, Liu makes several claims,

---

[1] "Peer review [is] the process by which physicians and hospitals evaluate and discipline staff doctors . . . ." *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1321 (11th Cir. 1994).

including federal claims pursuant to 42 U.S.C. §§ 1983 and 1988, and state law claims under Alabama and California law. Defendants interpose several affirmative defenses, including the Eleventh Amendment and the statute of limitations. For the reasons that follow, defendants' motions will be granted and Liu's motion will be denied.

*I. Summary Judgment Facts*[2]

Liu is a physician who practices general cardiology and interventional cardiology[3] in the Los Angeles, California area. From 1991 until his resignation on November 21, 2001, Liu was employed by UAB as a tenured associate professor/academic physician in the department of medicine. The undisputed material facts and relevant background information that led to Liu's resignation are

---

[2] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met his burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir. 1993). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir. 1989).

[3] Interventional cardiology is a specialty of cardiology. Webster's Medical Desk Dictionary 100 (1986)(defining "cardiology" as "the study of the heart and its action and diseases"). Interventional cardiology "refers to diagnostics and non-surgical treatments of the heart. Cardiac interventions are used to diagnosis [sic] and treat coronary artery disease, valvular heart disease, and congenital heart disease. http://www.stanfordhospital.com/clinicsmedservices/coe/heart/heartcenterservices/interventionalcardiology/default.

somewhat lengthy, but need to be stated.[4]

In 1991, Liu was recruited to the UAB School of Medicine by Dr. Gary Roubin ("Roubin"), the director of interventional cardiology. Liu became an assistant professor/academic physician in the interventional cardiology program, a subdivision of UAB's cardiology division.[5] At the time Liu assumed this position, the director of UAB's cardiology division was Dr. Pohost. In 1996, Bourge took over Dr. Pohost's position. Sometime thereafter, Roubin left UAB. From this time forward, until the year 2000, Dr. Larry Dean ("Dean") served, in some capacity,[6] as the acting director of the interventional cardiology program. From 1996 until 2000, in addition to the turnover in directors, several interventional cardiologists departed. As a result, Liu's workload increased significantly. In comparison with his peers, Liu handled a significant plurality of cases in the interventional cardiology

---

[4] If there are facts contained in this section that are disputed, the court will expressly note them as such.

[5] Dr. Pohost was the chief of the cardiology division until Dr. Bourge replaced him in 1996. Bourge remains the head of cardiology at UAB. http://cardiology.dom.uab.edu/index.html. The head of the UAB department of medicine is overall responsible for the cardiology division.

[6] The record creates some confusion as to whether Dr. Larry Dean was the acting head of the interventional cardiology program, the catheterization laboratory ("cath lab"), or both. Likewise, the record is unclear as to whether the terms "director of the interventional cardiology program" and "director of the cath lab" are synonymous. To illustrate, the record reflects Dean took over for Roubin in 1996 and served as the "acting" director of the interventional cardiology program until 2000. Yet, Liu testified that from 1996 to 2000, Dean was "acting director of the cath lab and was mostly concerned with administration, while most of the clinical work fell to Liu." In any event, Dean's full responsibilities are not of relevance. What is relevant is that the interventional cardiology program to some degree, has control over, and interaction with, the cath lab.

department, both during and after this decrease in the number of physicians.

In early 2000, Dean left UAB. Sometime prior to July, 2000, Bourge hired Dr. Greg Chapman ("Chapman") as director of the interventional cardiology program, thus filling the office vacated by Roubin. Prior to his promotion, Chapman served as an assistant professor at UAB. At all relevant times, Bourge's superiors included Dr. William J. Koopman ("Koopman"), head of UAB's Department of Medicine, and Dr. Scott Buchalter ("Buchalter"), UAB's Chief of Staff. Koopman served from 1995 until 2005 and approved Bourge's selection of Chapman.

*A. Professional disagreements between Liu and UAB*

Liu did not approve of Chapman as the new director of the interventional cardiology program and made no effort to disguise his displeasure with the appointment. Liu testified that Bourge told him that the program director's replacement would be at least as qualified as, if not more qualified, than Dean. In addition, Liu was under the impression that Dean's replacement would likely be hired from outside of UAB. After Chapman's hiring, Liu bluntly confronted his new superior.[7] Liu told Chapman that he lacked the professional acumen Liu had the right to expect. According to Liu,

_____

[7] The time line of events between 2000 and November 21, 2001, is not perfectly clear. The record fails to reflect to the exact dates of Liu's conversations with Chapman and whether these conversations occurred before or after Liu's June 10, 2000, letter. It is of little import, however, because it is merely background information.

4

Chapman's academic profile and interest in clinical research and cath lab work, particularly as compared with Roubin and Dean, failed to meet reasonable expectations. Liu claims that Bourge failed to keep his word concerning Chapman's hiring. Liu met with Chapman a second time, with little or no resolution concerning their professional differences. At this second meeting, Liu says Chapman said that Liu was "just angry." Liu agrees that he was probably angry, but says he was merely attempting to relay his concerns about maintaining UAB's highly renowned interventional cardiology program. This and other professional differences, between Liu and both Chapman and Bourge, were the catalyst for Liu's search for employment outside UAB.

On June 10, 2000, Liu wrote a letter to Bourge informing him that his departure from UAB was "imminent."[8] Liu received offers from other employers. Liu says that a conversation between Koopman and Liu's prospective employer motivated UAB to offer Liu a substantial raise. He accepted and decided to stay at UAB.

*1. January 2001 - July 17, 2001*

Prior to 2001, the record reflects that Liu received no

---

[8] Liu's letter also stated:

My only regret is that with all my hard work during the past 8 years and the strong foundation that [Roubin], myself and others have build [sic] for the Interventional Cardiology [sic], we have now reached a critical turning point with many uncertainties lying ahead. It will take strong leadership with clear vision to guide the Interventional Division through this treacherous time. I have full confidence in you that you will be successful in rebuilding the Interventional Cardiology.

discipline of any kind from UAB. In 2001, however, Liu's relationship with UAB deteriorated. Approximately mid-June 2001, there were at least three major conflicts between Liu, Chapman, and Bourge.[9]  First, on July 9, 2001, Chapman intervened and stopped a PCTA/PCI[10] procedure Liu was about to conduct on a patient with a lesion in the left coronary artery (hereinafter "PCTA/PCI  bypass issue").[11] The issue concerned the appropriate standard of care, particularly under the then current guidelines issued by the American College of Cardiology and the American Heart Association (hereinafter collectively "ACC/AHA").[12] According to Liu, although typically the proper action was a referral for bypass surgery, in certain cases, an angiogram[13] was the proper diagnostic procedure.[14]

---

[9] These events are largely memorialized in a letter of reprimand from Bourge to Liu dated July 17, 2001. Liu's response letter is dated July 24, 2001.

[10] A "percutaneous transluminal coronary angioplasty" or "PCTA" is defined as "a percutaneous transluminal angioplasty (hereinafter "PTA") of a coronary artery." Webster's at 528. For a full definition, see id.; see also Webster's at 382.

[11] A "lesion" is "an abnormal change in structure of an organ or part due to injury or disease." Webster's at 382.

[12] The term "standard of care" is a medical term of art which, unsurprisingly, is difficult to define. It likewise appears to be a moving target. At a minimum, according to Bourge, the term in this context includes UAB's "Standard of Care" Manual, the UAB bylaws, ACC/AHA guidelines, and the minutes and oral instruction of faculty meetings. According to Bourge, UAB's standard of care has both administrative and operational components to which physicians must adhere. The court finds that the interplay of the standards of care is of little consequence to the court's analysis going forward.

[13] An angiogram is "a roentgenogram (a photograph made with an X-ray) made by an angiography." Webster's at 33, 624 (1986). An angiography is "the roentgenographic visualization of the blood vessels after injection of a radioopaque substance." Id. at 34. "Radioopaque" is defined as "being opaque

Chapman disagreed, intervened and stopped the procedure. Chapman warned Liu that if he continued to do the procedure, Chapman would remove his cath lab privileges. In a July 24, 2001, response letter, Liu memorialized his belief concerning the PCTA/PCI issue. He averred that although ACC/AHA periodically published procedural guidelines for PCTA/PCI issues, "interventional cardiology is a very rapid evolving field and the guidelines generally lag[ ] behind the new concepts and practices. PCTA of left main artery is a common practice . . . [and] forty cases of left main PCTA have already been performed at UAB in the past two years." July 24, 2001 letter from Liu to Bourge.

Second, in early 2000, UAB's policy changed concerning physician visitation of patients. The new policy required UAB attending physicians, and not merely their physician extenders,[15]

_____

to radiation and especially X rays." *Id.* at 601. "Opaque" in this context means "not pervious to radiant energy." *Id.* at 493.

[14] Liu testified:

There is an issue among the [sic] all angiographers, people who does the angiogram. The reading and assessment of the severity of a blockage varies from one end to the other. And that is the way it is. So people disagree with what other people want to do. It's a very common thing. It's not uncommon. One angiographer think [sic] the lesion is significant. The other think no [sic].

And its been studied. They sent out a number of films to have a number of well-known interventionalists, angiographers review them. And the assessment of those same lesions among all these well-known, well-respected angiographers ranging from one way to the other [sic] because your eyeball assessment is different. The way you look, compare is different. The way you practice is different.

Liu Deposition, at 117-118.

[15] The label "physician extenders" generally refer to a category of non-physician hospital staff, including physician assistants, nurse practitioners, and clinical nurse specialists.

to visit each patient on their day of discharge from UAB. Liu says that Chapman came to Liu and ordered him to visit each of his patients in accordance with this policy.[16] Bourge testified that several anonymous UAB staff members informed him that Liu's "patients . . . may go for days without seeing Liu." Upon learning of this, Bourge says that he looked into Liu's patient's files. He discovered notes in Liu's files which indicated Liu visited patients on certain days, when in fact, Bourge believed Liu had not. Thus, he drew the inference that Liu had falsified the notes. Liu does not expressly deny these assertions.

Third, Liu was accused of performing "elective procedures" at 11 P.M., in violation of UAB's "emergencies only policy" for procedures after 7 P.M. Liu insists that the only procedures he did after 7 P.M. were, in fact, emergencies, and that it was actually the late night hospital staff, i.e., nurses, who usurped his authority and determined, on their own, that a particular case was or was not an emergency.[17] Liu argued that only the physician's

---

[16] Liu testified that typically a physician's assistant or nurse practitioner would see the patient and discharge the patient in the morning. Liu alleged there was no requirement that an attending physician also be involved.

[17] Concerning his relationship with Chapman and the post 7 P.M. procedures, Liu testified:

> If [Bourge] put in somebody good, I will try to work with him. Larry Dean was fine. At least he had the leadership. Chapman does not have leadership. He want [sic] to work from 8 to 5. He want [sic] to go home at 5. He want [sic] to have dinner with the family. Very important to him. To me as an interventional cardiologist, you can't do that. Sorry. . . . According to my understanding [of the standards for an interventional cardiologist director at UAB, Chapman's] performance had not been up to that standard.

judgment mattered and urged Bourge to reconsider this rule.

*2. July 18, 2001 - October 26, 2001*

Discussions began between Liu and his former colleague Pohost about the possibility of Liu's leaving UAB for the University of Southern California Hospital ("USC"). Sometime in August, Liu went to USC for an interview. According to Liu, following the interview, Pohost spoke with Bourge about Liu. Liu says Bourge told Pohost he was going to force Liu to resign. There is no confirming testimony from Pohost. Around this time, another patient incident added to UAB's growing concerns. Liu performed a PTCA/PTI on an obese patient, which eventually led to the patient's emergency return to UAB for a hematoma[18] of the groin (hereinafter "PCTA/PTI hematoma issue").[19] The parties dispute which procedure or lack of procedure was the cause, in fact, of the hematoma complication.

Liu contends that the day after he performed the PCTA/PCI, another interventional attending physician visited his PCTA/PCI patient and found a pseudoaneurysm ("a vascular abnormality that resembles an aneurysm in roentgenography") in the groin, whereupon, a vascular surgeon was consulted. Webster's at 584-85. Liu claims that the vascular surgeon found that the pseudoaneurysm was not

Liu Deposition, at 206-207.

[18] A "hematoma" is "a tumor or swelling containing blood." Webster's at 286.

[19] The groin was the puncture sight for the PCTA/PCI operation Liu performed.

severe enough to require an immediate operation. According to Liu, this took place on a Saturday, and the vascular surgeon told the patient to return Monday to ensure no complications. On Monday, the patient returned, and the vascular surgeon sent the patient home without operating, because the aneurysm was not severe. According to Liu, culpability lay squarely with the vascular surgeon for discharging the patient. Bourge testified he was ultimately more concerned that Liu undertook an unnecessary PCTA/PCI than with the discharge of the patient by the surgeon.

On or about October 9, 2001, Bourge met with Liu. The specifics of the discussion are not altogether clear, nor are they undisputed. What is clear is that the parties discussed the PCTA/PCI hematoma issue. Liu says that Bourge told him to resign to avoid Bourge's submitting of the PCTA/PCI hematoma issue to a peer review committee. Importantly, Bourge and Koopman testified that the PCTA/PCI bypass and hematoma issues were not the only incidents with respect to Liu's practice in the months leading up to the October 9, 2001, notice of referral to peer review. However, they refused to testify further about other incidents, claiming Alabama's peer review privilege.

On October 24, 2001, Liu wrote Koopman a letter memorializing the October 9, 2001, meeting with Bourge. The letter also provided Liu's stance on certain patient care issues, including the PCTA/PCI hematoma issue. Liu stated, "I stand by my decision to perform what

10

I consider a necessary PTCA to [sic] the best interest [sic] of my patient and welcome the opportunity to explain and defend my decision to the Quality Assurance Committee."[20]

In a letter dated October 26, 2001, Koopman summarily suspended Liu from "UAB Health System medical staff membership and clinical privileges based on [the Division of Cardiovascular Disease's] concerns that [Liu's] continued practice may result in an imminent danger to the health of the patients under [Liu's] care." After consulting with university attorneys, the bylaws,[21]

---

[20]    The record is unclear as to the sequence of events and the actual names of each peer review committee. Bourge stated there was a Quality Assurance Committee, where initial reportable incidents would be taken. It is uncertain if Bourge spoke with the Quality Assurance Committee after the October 9, 2001 meeting, or whether the first "committee" to review Liu's case was the "Ad Hoc Committee." *See infra* note 22 and accompanying text.

[21]    Section 13.3 of the UAB Bylaws states in pertinent part:

13.3 SUMMARY SUSPENSION.
The Chief of Service concerned, or the Chief of Staff, shall have the authority to summarily suspend a Practitioner's medical staff membership and clinical privileges where failure to do so may result in an imminent danger to the health of any individual. Suspension shall become effective immediately, and the Practitioner's patients shall be assigned to another Practitioner by the Chief of Service or Chiefs of Staff. The Credentials Committee will review the summary suspension as soon as possible, but in any event, no later than 14 days after the summary suspension becomes effective. The committee may modify, continue or terminate the terms of the Summary Suspension. If the committee continues the Summary Suspension, the practitioner shall have the right to review, as set forth in Article XIV. . . .

The process does not end with the Credentials Committee. The UAB bylaws also provided for an appeal to the Medical Staff Committee. Article XIV provides:

XIV. HEARING AND APPELLATE REVIEW
14.1 NOTICE OF ADVERSE ACTION
The Credentials Committee will forward all recommendations to the Medical Staff Committee. The Medical Staff Committee will furnish a written notice to the Practitioner advising the practitioner of the Adverse Action that is recommended; the reasons for the recommendation; that the Practitioner has thirty days after the date of the notice within which to submit a written request for a

and the head of the "Credentials Committee," Koopman testified he then handpicked an internal "Ad Hoc Committee" of Liu's peers from varying specialities.[22] Liu alleges, *inter alia*, that this committee was hand picked by Bourge, that the committee members were influenced by Bourge, and that the Ad Hoc Committee was entirely unfair.

*3. October 27, 2001 - November 21, 2001*

In a letter dated October 29, 2001, Koopman requested Liu to provide the name of a physician, external to UAB, to participate in the peer review process. Liu replied with Dr. Entman from Baylor University, a physician he did not know personally. Entman and at least one other physician from outside UAB were retained for peer review. Koopman testified UAB provided a package of selected

---

hearing; and a summary of the Practitioner's rights in the hearing, including notification that the hearing panel will not be composed of any individual in direct economic competition with practitioner; the **right to representation by an attorney or other person of the practitioner's choice; the right to have a record made of the proceedings; the right to call, examine and cross-examine witnesses; the right to present evidence determined to be relevant by the hearing panel; the right to submit a written statement at the close of the hearing;** and upon completion of the hearing; the right to receive the written recommendation of the panel including a statement of the basis for the recommendation.

(emphasis supplied).

[22]  The Ad Hoc Committee consisted of Dr. McGiffin, Dr. Young, Dr. Plumb, and Dr. Whitten. This committee gave a report to the ultimate peer review committee, the standing "Credentials Committee." Koopman received a copy of its report. According to Koopman, the Ad Hoc Committee was charged with two issues. First, "whether cardiac catheterization and interventional procedures such as PTCA as performed by Dr. Liu at UAB had been performed in the absence of clear indications and thus far outside the standard of care in the cardiology community or presented unwarranted risk to the patient." Second, "whether Dr. Liu adequately addressed and remedied these performance issues over a period of time."

"problem" cases for these external reviewers and for the Credentials Committee. On or about October 31, 2001, Liu retained attorneys Edward Hardin and Bernard Nomberg. The record reflects that Nomberg primarily handled the matter.

On November 8, 2001, in a letter from Buchalter to Liu, Buchalter informed Liu that the Credentials Committee voted on November 7, 2001, to continue the summary suspension of October 26, 2001, pending the report of the Ad Hoc Committee. On November 16, 2001, the Ad Hoc Committee made its report to the Credentials Committee. In a letter dated November 21, 2001, the Credentials Committee "voted unanimously to recommend the revocation of [Liu's] clinical privileges and medical staff membership and to continue the summary suspension imposed on October 26, 2001 . . . ."

On the same day, Liu resigned. Liu testified that he discussed the Ad Hoc Committee's action with Nomberg. According to Liu, Nomberg told him if "we resign now, it would be okay." Liu Deposition, at 134. Notably, Liu alleges in paragraph eleven of his complaint that "on advice of counsel and in the good faith belief that he possessed the credentials and professional reputation to obtain comparable employment elsewhere, he submitted his resignation on November 21, 2001." Liu thus did not exercise the right contemplated by the UAB bylaws to participate in the peer review of his summary suspension, nor did he utilize the UAB appeal process. Liu testified that he knew that the report would be

13

submitted to the National Practitioner Data Bank ("NPDB"). UAB submitted the adverse report to the NPDB, as it was required to do. Although the record is not entirely clear, it appears that the NPDB report states "resignation during the pendency of an investigation."

*4. November 22, 2001 - February 28, 2007*[23]

Nomberg represented Liu until approximately January, 2004. During the first few months following Liu's resignation, Nomberg communicated frequently with Patricia J. Pritchett ("Pritchett"), General Counsel for the University of Alabama Health Services Foundation. Conversations between Nomberg and Pritchett centered around Liu's applications to USC. There was no threat of legal action for a denial of due process. Liu applied to USC for the position of associate professor/academic physician with clinical privileges. USC requested Liu to provide certain information from UAB, specifically concerning the peer review process and his suspension. According to Liu, Pohost communicated with USC's credentializing committee and UAB about getting some documentation from UAB, so that Liu's USC application could proceed. Around January 2001, the parties agreed, all after consultation with their respective counsel, that Bourge would write a recommendation letter to USC on Liu's behalf.

*a. The recommendation letter.*

---

[23] On February 28, 2007, Liu filed the instant action.

The following letter dated February 12, 2002, is the result of the conversation between USC, UAB, and Liu[24]:

UAB SCHOOL OF MEDICINE

Department of Medicine
Division of Cardiovascular Disease

CONFIDENTIAL

February 12, 2002

To Whom it May Concern:

Re: Ming Wei Liu, MD

This letter is written in response to your written request for a recommendation concerning Dr. Ming Wei Liu. Thank you for providing Dr. Liu's written informed consent.

Dr. Liu came to UAB in October, 1991 as a Research Fellow, upon the recruitment of Dr. Gary Roubin to our institution as head of the Section of Interventional Cardiology. Dr. Liu then became a Visiting Assistant Professor in the Division of Cardiovascular Disease in December, 1992. He joined the faculty as an Assistant Professor on a tenure earning track on June 1, 1992. I have known and worked with Dr. Liu since his arrival at UAB and from September of 1996, I have served as his supervisor in my role of Director of the Division of Cardiovascular Disease.

Dr. Liu is an intelligent, compassionate, and hard working physician. His work ethic is outstanding. In 1997 to 1998, we had the unfortunate circumstance to lose 4 of our 6 interventional cardiology faculty due to retirement or recruitment to other institutions. Ming was instrumental in picking up the vast majority of the clinical load of many interventional procedures until new faculty were recruited over the subsequent 6 months. He has excellent patience and skill in the performance of interventional cardiology and other interventional

---

[24] According to Liu, UAB sometimes fails to release documentation when there is an inquiry by NPDB.

vascular procedures, as well as the use of a variety of devices to perform these procedures. During his last 4 years at UAB, he was the most clinically productive interventional cardiologist on our staff. During his tenure, he successfully completed and passed the ABIM subspecialty examination for interventional cardiology. His other academic accomplishments are outline in his Curriculum Vitae.

Unfortunately, in late 2000 and early 2001, it came to my attention that some of Dr. Liu's performed procedures, planned procedures, certain aspects of medical care, and his hospital chart documentation were not within the standard of care at our institution. Because of these problems, and after multiple discussions with myself and the head of the Section of Interventional Cardiology with no change in the pattern of these activities, he was placed on probation by myself and the Chair of the UAB Department of Medicine on July 14, 2001. In October of 2001, it was brought to my attention that certain procedures performed by Dr. Liu continued to be outside of the standard of care at our institution. After a discussion with me regarding these cases, no satisfactory resolution to the problem was obtained. Subsequently, Dr. Liu's medical staff privileges were summarily suspended on October 26, 2001. On November 21, 2001, Dr. Liu resigned his faculty and medical staff appointment at UAB.

While the above circumstances certainly cast a unfortunate shadow on Dr. Liu's career, he is a highly skilled and compassionate physician. I believe, however, if Dr. Liu was allowed to perform interventional procedures, in an individually supervised fashion over a 12-month period, then he has the ability to be an outstanding addition to the staff at an academic medical center. This supervision should include review of all angiograms with a well qualified interventional cardiology board certified mentor prior to any procedure, and then approval of that mentor prior to proceeding with interventional procedure. Indeed, I would trust him under those well-defined circumstances, to perform a procedure on myself or a member of my family. Upon the satisfactory completion of this 12-month mentorship, he could then move toward a less supervised and more independent position, but with continued indefinite post-hoc peer review of his clinical activities.

16

I believe that this letter outlines the outstanding positive attributes of Dr. Ming Liu, including his work ethic, technical proficiency, compassion for his patients, academic achievements, and key clinical issues addressed by our institution. If a position were made available to Dr. Liu within the guidelines outlined above, and he accepted those practice restrictions, I believe he would continue to contribute to outstanding patient care and be [sic] very productive faculty member at your institution.

Sincerely,


Robert C Bourge, MD
Professor of Medicine, Radiology, and Surgery
Director, Division of Cardiovascular Disease.


Upon receiving this letter, USC requested Liu to produce edifying information concerning the year 2001 cases that Bourge said were not within UAB's "standard of care." UAB refused to expand the dialogue, claiming Alabama's peer review privilege. USC still insisted. On at least three separate occasions in 2002, USC requested Liu to produce peer review information from UAB. These requests concerned several topics, including the nature and scope of UAB's investigation, whether there were any complications and/or unexpected mortalities, and the specific findings of the peer review committee. Upon each request, UAB claimed Alabama's peer review privilege. Liu considers Bourge's letter not to be a "recommendation", but rather a personal attack.

In a letter dated January 24, 2002, Entman wrote to USC at Liu's behest. Entman said in pertinent part:

Bourge sent me some of [Liu's] cases to review [in

17

> my peer review capacity]. . . .
> . . . .
> Review of the cases revolved around some interesting issues. In fact, there are not clear standards of practice for Interventional Cardiology and the profession tends to collect some very competent but aggressive practitioners. Bourge felt that UAB ought to develop their own standards of practice with regard to interventional cardiology and, I think one of the underlying difficulties was that Liu was somewhat more aggressive. **I will admit that I probably would have done something different with some of the patients that were reviewed but I don't think that decision[s] that were made were beyond what might be expected in some places.** . . . As I am sure you know, this type of issue arises frequently with creative young faculty and it would be a terrible shame if a career were ruined by some rash political behavior.

(emphasis supplied). There is nothing surprising about physicians having differences of opinion about what is the better medical procedure. During this period, Liu not only applied to USC, but also to several other hospitals. On each occasion, he signed extensive releases, waiving all claims against both the requesting hospitals, e.g., USC, and the providing hospital, UAB. In these releases, Liu expressly waived any rights against hospitals resulting from the "disclosure" of peer review materials. Eventually, Liu was granted clinical privileges at hospitals in the Los Angeles area. His continued attempts to gain employment with USC, however, were unsuccessful. Around 2005, USC advised him to go into private practice for one year and reapply. Liu went into private practice; however, he reapplied six months later. USC again denied his application. Currently, Liu is employed, with

18

privileges, by at least two hospitals in the Los Angeles area.[25]

Liu's central argument is that Bourge and the Board initiated the peer review process for the purpose of preventing him from receiving a promotion or another increase in salary at UAB. Liu avers that Bourge expressly told him that he was going to force him to resign. Liu likewise alleges Bourge and/or Chapman schemed to force Liu out of UAB because of his high-volume of referrals and patients. Overall, Liu alleges that the peer review process was initiated in bad faith and/or with malice.

## II. Pertinent Procedural Issues

### A. Liu's Amended Complaint

In his original complaint, Liu asserted both diversity jurisdiction under 28 U.S.C. § 1332(a) and federal question under 28 U.S.C. § 1331. He subsequently amended his complaint to add claims under 42 U.S.C. § 1983. The amended complaint supercedes the original complaint. *Pintando v. Miami-Dade Housing Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). As discussed *infra*, Liu now concedes that all claims for monetary damages are barred by the statutes of limitations. However, he has failed to address whether his basis for diversity jurisdiction still exists. Nor has either defendant addressed this issue. The court finds that any basis for diversity

---

[25] The record creates some confusion as to the number of hospitals where Liu is currently employed. Liu's complaint states he is employed with privileges at California Hospital Medical Center and Garfield Medical Center. However, in Liu's deposition, Liu testified he was employed with privileges at White Memorial Medical Center, Good Samaritan, and St. Vincent's Hospital (Los Angeles). The distinction is of no relevance to the court's analysis.

jurisdiction disappeared after Liu's concession about the statute of limitations. Bound by the Eleventh Circuit's plaintiff-viewpoint rule, *see Ericsson GE Mobile v. Motorola Communications*, 120 F.3d 216 (11th Cir. 1997), the court must determine whether the possible benefit to be obtained by Liu from the injunction he seeks is sufficiently measurable and certain to satisfy the requisite $75,000 amount in controversy. *Id.* at 221; *see also Fidelity Warranty, Inc. v. Kidd*, 45 F. Supp. 2d 1284 (N.D. Ala. 1999), *aff'd*, 196 F.2d 1262 (11th Cir. 1999), *reh'g en banc denied*, 204 F.3d 1124 (11th Cir. 1999), *cert. denied*, 529 U.S. 1069, 120 S.Ct. 1679 (2000). Assuming that the value of the requested mandatory injunction is not merely the cost of copying and mailing peer review documents, and includes the possible economic benefit to Liu of obtaining a second chance review of his UAB record by USC and other prospective employers, the court finds this is too speculative and immeasurable to satisfy the amount in controversy requirement. If USC should find that UAB appropriately suspended Liu, Liu stands to gain nothing from its review of his performance at UAB. In other words, if this court should grant Liu the relief he seeks, he could be negatively impacted rather than be helped in influencing the hiring decisions of California credentializing committees. Accordingly, there is no basis for a finding of the requisite amount in controversy. The court lacks jurisdiction under 28 U.S.C. § 1332. The court proceeds only because there is federal

question jurisdiction under 28 U.S.C. § 1331, and possible supplemental jurisdiction under 28 U.S.C. § 1367(a). Liu's federal and state claims originate from the same common nucleus of operative fact. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130 (1966).

Liu's amended complaint seeks relief both under federal and state law. Liu does not distinguish between defendants. He appears to be aiming all of his claims at both the Board and Bourge. Although ambiguous, Liu apparently is attempting to sue Bourge both in his official capacity and as an individual. The federal claims by Liu are as follows:

> [**CLAIM 1**]. To the extent that the Alabama peer review statute 1975 Ala. Code §§ 6-5-333 and 22-21-8 prohibits disclosure of peer review information to peer review authorities in other States upon express request of such peer review authorities, it violates the Quality Healthcare Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.*,[26] and is therefore unconstitutional under the Supremacy Clause of the United States Constitution, and the substantive and procedural due process of law, and equal protection of law under the Fourteenth Amendment thereof.

> [**CLAIM 2**]. To the extent that the Quality Healthcare Improvement Act of 1986, 42 U.S.C. § 11101, *et seq.* permits the non disclosure of peer review information to peer review authorities in other States upon express request of such peer review authorities, it violates the substantive and procedural due process of law, and equal protection law provisions of the Fourteenth Amendment of the United States Constitution, and is

---

[26] The statute is named the Health Care Quality Improvement Act of 1986 42 U.S.C. § 11101, *et seq.*, not the Quality Healthcare Improvement Act. *See* HCQIA, Pub. L. No. 99-660, § 401, 100 Stat. 3743 (1986). The court assumes this is a typographical error.

therefore unconstitutional.

[**AMENDMENT**] The acts and omissions of the Defendants as described herein were taken under color of law and deprived Plaintiff of his rights to substantive and procedural due process of law resulting in damage to him; all in violation of 28 U.S.C. §§ 1983, 1988. The Defendant Bourge knew, or should have known, that his acts and omissions as described herein violated the clearly established constitutional rights of the plaintiff.

In his amendment, Liu added the section styled "amendment." This "amendment" does not make clear whether it is intended to apply to both preceding claims. Despite this ambiguity, the court finds that Liu intended it to apply both to claim 1 and to claim 2, and treats it as such.

Liu also invokes the law of California and the law of Alabama. Liu attempts to present two claims under California law. He styles one "Intentional Interference with Prospective Economic Advantages" and the other "Implied Cause of Action Under California Business and Professional Codes." Under Alabama law, Liu makes only one claim, which he styles "Cause of Action for Intentional Interference with a Business or Contractual Relation."

Liu initially sought money damages as well as equitable relief. As discussed, above and below, Liu concedes that money damages are not recoverable. Accordingly, Liu's prayer for relief is limited to declaratory and injunctive relief.

B. Statute of Limitations Concession and Equitable Tolling

In Liu's filing styled "Consolidated Response to Defendants'

Motions for Summary Judgment," Liu concedes that his claims for damages are time-barred. In *Wilson v. Garcia*, 471 U.S. 261, 268-69, 105 S. Ct. 1938, 1943-44 (1985), the Court held that claims under 42 U.S.C. § 1983 borrow the pertinent state's statute of limitations for personal injury actions. The statute of limitations for personal injury actions in Alabama is two years. Ala. Code § 6-2-38 (1975).[27]

Liu requests that the anticipated dismissal of his time-barred claims be without prejudice, because he desires a "re-filing in the event facts emerge that would justify a good-faith 'tolling' argument; particularly if any additional 'To Whom it May Concern' letters emerge later." The court denies Liu's request for such a reprieve. Federal courts should "generally refer[] to state law for tolling rules", and "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Wallace v. Kato*, 127 S.Ct. 1091, 1098-99 (2007)(citations omitted). There appears to be nothing uncommon about a litigant failing to unearth what he hoped to find in discovery. Liu having provided no justification for an invocation of the doctrine of equitable tolling, his time-barred § 1983 damage claims will be dismissed with prejudice.

*C. What Claims Remain?*

---

[27] California's statute of limitations for personal injury actions is likewise two years. Cal. Civ. Proc. Code § 335.1 (2002).

Liu's complaint, as amended, contains two federal claims and several state law claims. In federal claim 1, Liu contends that Alabama peer review statues are unconstitutional under the Supremacy Clause to the extent that they transgress upon the provisions of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101, *et seq.,* and that they violate substantive due process, procedural due process, and equal protection. In federal claim 2, Liu alleges that to the extent the HCQIA is construed to countenance non-disclosure of peer review information to peer review authorities in other states, the non-disclosure violates his substantive, procedural, and equal protection rights. In his motion for partial summary judgment, he argues only that his "substantive and procedural rights" were violated, and he makes no Supremacy Clause argument, arguably abandoning it. The fact that Liu filed his motion for partial summary judgment prior to his concession of no entitlement to money damages exacerbates the problem of determining what is left.

In Liu's earlier response to defendants' motions to dismiss, he said that he was relying on two legal theories, "[v]iolation of [his] Fourteenth Amendment right to pursue his chosen profession as a medical clinical educator, and violation of state laws prohibiting the intentional interference with business and economic relations." Liu does not satisfactorily explain how the Fourteenth Amendment establishes a right to pursue one's chosen calling.

*III. The Board's Motion for Summary Judgment*

In ruling on the Board's Rule 56 motion, the court begins and ends with its agreement with the Board's challenge to jurisdiction.

The Board interposes the immunity provided by the Eleventh Amendment,[28] which applies to § 1983 claims. *Quern v. Jordan*, 440 U.S. 332, 340-41, 99 S.Ct. 1139, 1144-45 (1979). If the suit against the Board is barred by the Eleventh Amendment, the court need not address the adequacy of Liu's claims against the Board or the Board's non-jurisdictional defenses.

To determine whether the Eleventh Amendment immunizes a particular governmental entity from suit in federal court, the court must conduct a multi-tiered analysis. First, the court must determine if the governmental entity is an arm or instrumentality of the state. The Board is. *See, e.g., Harden v. Adams*, 760 F.2d 1158 (11th Cir. 1985), *cert. denied sub. nom. Grimmer v. Harden*, 474 U.S. 1007, 106 S. Ct. 530, 88 L. Ed. 2d (1985)("The Alabama Supreme Court has held . . . that state universities . . . are agencies or instrumentalities of the state.")(citations omitted). Next, the court must determine if the state entity has waived its Eleventh Amendment immunity and/or whether Congress has lawfully

---

[28] The scope of the Eleventh Amendment to the United States Constitution is textually limited: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. However, a facial reading of the Amendment has been rejected by the Supreme Court. *See Hans v. Louisiana*, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890). As a result, the States' sovereign immunity in federal court is vast.

abrogated the state's Eleventh Amendment immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S. Ct. 2666, 49 L. Ed. 2d (1976). If Eleventh Amendment immunity is not waived or expressly abrogated, the Eleventh Amendment serves as an absolute bar. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984). It also applies "regardless of whether the plaintiff seeks money damages or prospective injunctive relief." *Stevens v. Gay*, 864 F.2d 113, 115 (11th Cir. 1989)(citing *Pennhurst,* 465 U.S. at 100-101, 104 S. Ct. at 907-908).

There is absolutely no basis for an argument that Alabama has waived its Eleventh Amendment immunity, leaving the court only with the question of whether Congress has expressly abrogated the Eleventh Amendment immunity under these circumstances.  In order to determine whether Congress has abrogated Eleventh Amendment immunity, the court must first determine whether Congress has "unequivocally expressed its intent to abrogate the immunity, and, second, whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of Florida v. State of Florida*, 517 U.S. 44, 55, 116 S. Ct. 1114, 1123 (1996)(internal punctuation and citations omitted).

It is clear that there is nothing in § 1983 that purports to abrogate Eleventh Amendment Immunity. In order to determine whether Congress intended to abrogate the States' sovereign immunity through the HCQIA, the court looks to the text and plain meaning of

the statute. In § 11115(a)("Construction") of the HCQIA, for

subchapter I, 42 U.S.C. §§ 11111-11115, Congress provides:

> Except as specifically provided in this subchapter,
> nothing in this subchapter shall be construed as changing
> the liabilities or immunities under law or as preempting
> or overriding **any** State Law which provides incentives,
> **immunities,** or protection for those engaged in a
> professional review action[29] that is in addition to or
> greater than that provided by this subchapter.

42 U.S.C. § 11115(a)(emphasis supplied). This court concludes that

Congress did not intend the HCQIA to abrogate Eleventh Amendment

immunity. Indeed, in passing the HCQIA, Congress intended the exact

opposite. *See id.* The court need not address the "valid exercise of

---

[29] The HCQIA provides the following definition of "professional review action":

> [A]n action or recommendation of a professional review body which is
> taken or made in the conduct of professional review activity, which
> is based on the competence or professional conduct of an individual
> physician (which conduct affects or could affect adversely the
> health or welfare of a patient or patients), and which affects (or
> may affect) adversely the clinical privileges, or membership in a
> professional society, of the physician. Such term includes a formal
> decision of a professional review body not to take an action or make
> a recommendation described in the previous sentence and also
> includes professional review activities relating to a professional
> review action. . . .

42 U.S.C. § 11151(9). A "professional review body" is defined as a "health care
entity and the governning body or any committee of a health care entity which
conducts professional review activity, and includes any committee of the medical
staff of such an entity when assisting the governing body in a professional
review activity. 42 U.S.C. § 11151(11). A "professional review activity" is
defined as:

> "[A]n activity of a health care entity with respect to an individual
> physician:
>
> (A) to determine whether the physician may have clinical privileges
> with respect to, or membership in, the entity,
>
> (B) to determine the scope or conditions of such privileges or
> membership, or
>
> (C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10).

power" issue under § 5 of the Fourteenth Amendment. The Board is an Alabama instrumentality, Alabama has expressly preserved its Eleventh Amendment immunity, and Congress has not abrogated it under the HCQIA. The Board is immune from suit in this court.

The court has no jurisdiction to consider any of Liu's claims against the Board. All claims against the Board will be dismissed.

### IV. Bourge's Motion for Summary Judgment

Turning to Liu's § 1983 claims against Bourge, the court notes the problem that pokes its head up too often in § 1983 cases, namely, how to determine when a person is being sued only in his official capacity, or only in his individual capacity, or in both capacities. While Liu makes no effort in his complaint to address this distinction, the proceedings fail to suggest logically that Bourge is being sued in any capacity other than his official capacity. *See Colvin v. McDougall*, 62 F.3d 1316, 1318 (11th Cir. 1995)("In trying to determine in what capacity [defendant] was sued, we look at the complaint and the course of proceedings.")(citation omitted); *see also Young Apartments v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1048 (11th Cir. 2008)(solidifying the holding of *Calvin*; noting that the Eleventh Circuit utilizes what it calls the "course of proceedings test"). Even if Liu had specifically alleged that Bourge is liable as an individual, Liu's concession that he cannot recover money damages forecloses the possibility that any individual capacity claims, even equitable,

can remain against Bourge. Even an injunction against Bourge in his official capacity would prove difficult, if not impossible, to enforce if it should mandate that Bourge disgorge peer review materials that are not in his custody or control. The court will assume for the purposes of the following discussion that Bourge is being sued only as an official of the Board.

*A. Does the Eleventh Amendment bar Liu's claims against Bourge?*

The court must determine whether Liu's equitable claims against Bourge in his official capacity under § 1983 are barred by the Eleventh Amendment, as are the claims against the Board. Liu contends that the legal fiction of *Ex parte Young* gets around the Eleventh Amendment because he seeks only prospective equitable relief against a named state official. *See Ex parte Young*, 209 U.S. 123 (1908), *and Verizon Maryland, Inc. v. Public Svc. Comm'n*, 535 U.S. 635, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002). In *Verizon*, the Court instructed: "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 645 (citations and internal quotations omitted). Conducting *Verizon's* straightforward inquiry, the court finds, assuming the relief Liu seeks is granted, namely, the release of peer review documents and files, that it will be prospective. Furthermore, such relief will not subtract in

29

any significant way from the state treasury. It is equitable in nature, so that Liu's official capacity claims against Bourge can proceed, if only in theory.

*B. Does the statute of limitations bar Liu's equitable claims?*

Before turning to the merits of Liu's § 1983 claim against Bourge, the court must deal with Bourge's statute of limitations defense. Bourge says that the statute of limitations bars Liu's claims for both legal *and* equitable relief. Bourge contends that Liu's equitable claims, like his damage claims, are time-barred. Bourge says that the "concurrent remedy doctrine" applies and that the equitable and legal statute of limitations are the same. The court respectfully disagrees. Rather self-defining, the concurrent remedy doctrine stands for the proposition that "where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred . . . ." *Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1326-27 (11th Cir. 2007)(citations omitted). Although Liu poorly expresses his contention, he must be depending upon an exception, the "continuing violations doctrine,"[30] holding that the limitations period will be

---

[30] The continuing violations doctrine is defined as:

[T]he statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the statute of limitations period. In determining whether to characterize a violation as continuing, it is important to distinguish between the present consequences of a one-time violation, which do not extend the limitations period, and a continuation of a violation into the present, which does.

*Nat'l Parks & Conservation Ass'n,* 502 F.3d at 1322 (citations and internal

tolled if there is a "a continuing violation into the present." *Id.* at 1322 (internal quotation marks and citations omitted). Assuming that this problem even applies to a claim under *Ex parte Young*, a dubious proposition,[31] the court finds that if Liu's claims are meritorious, the concurrent remedy doctrine does not apply. Put simply, if there is an ongoing violation of federal law, as Liu claims, there must be a "continuing violation." If Liu's claims have merit, and if the failure to disclose documents is a violation of due process, the continuing failure of Bourge to disclose the documents is probably an ongoing violation. Bourge's statute of limitations defense does not apply to prospective equitable relief. Also of note, Bourge's defense of qualified immunity does not apply to prospective relief. *Fortner v. Thomas*, 983 F.2d 1024 (11th Cir. 1993)(noting that there is no qualified immunity defense for equitable relief). If Bourge were being sued for money damages under § 1983, he would most assuredly be qualifiedly immune.

*C. Section 1983 Framework*

It goes without saying that § 1983 creates only a cause of action, and not a specific, federally protected right. As the Eleventh Circuit has instructed:

---

quotations omitted).

[31] Defendants have not cited a case where the concurrent remedy doctrine has barred relief via *Ex parte Young*. Liu has likewise failed to rebut this claim with any precedent whatsoever. The court has likewise not found any persuasive precedent that discusses the interplay between *Ex parte Young* and the continuing violations doctrine. The court is unconvinced that the concurrent remedy doctrine applies here.

To state a claim for relief in an action brought under §
1983, plaintiffs must establish that they were deprived
of a right secured by the Constitution or laws of the
United States, and that the alleged deprivation was
committed under color of state law. Like the state-action
requirement of the Fourteenth Amendment, the under-color-
of-state-law element of § 1983 excludes from its reach
merely private conduct, no matter how discriminatory or
wrongful.

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d

1263, 1276-77 (11th Cir. 2003)(quoting *American Mfrs. Mut. Ins. Co.*

*v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 985, 143 L. Ed. 2d

130 (1999)). In other words, Liu must prove that Bourge is a person

acting under the color of state law, who, while so acting, caused

a violation of a federal statute or of the U.S. Constitution. *See*

*Hale v. Tallapoosa County*, 50 F.3d 1579, 1581 (11th Cir. 1995). The

requirement of "under the color of state law" has been treated the

same as "state action" for Fourteenth Amendment purposes. *See id.*

at 1276 n.4.[32] The disputed question is whether Bourge's conduct,

and his invocation of Alabama's peer review privilege, deprived Liu

of a federally protected right, namely his constitutional right to

due process and/or his federal right under the HCQIA.

D. *The Merits: Deprivation of a Federal Right?*

Liu argues: (1) that Alabama's peer review statutes violate

_____

[32] In the instant action, no party disputes that Bourge is a "person"
for purpose of § 1983.  Nor do the parties dispute that Bourge's action was
not "state action."  Prior to Liu's concession on damages, Bourge disputed
whether he was a "person" for purposes of § 1983. However, post concession,
Bourge wisely omitted any defense that he was not a "person" for purposes of
equitable relief. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71
n.10 (1989)(holding that state officials were persons for the purposes of §
1983 when sued in their official capacity for prospective relief).

the Supremacy Clause based on his interpretation of the "essential purpose" of the HCQIA; (2) that Alabama's peer review statutes do not apply in this court pursuant to Rule 501 of the Federal Rules of Evidence; (3) that even if they do, they only require a "need to know" rule of confidentiality, and alternatively, that Bourge's actions were taken in bad faith and/or with malice; and (4) that if Rule 501 precludes the invocation of Alabama's peer review statutes, Liu's substantive, procedural, and equal protection rights were violated, thus establishing a violation of a federal right. Before turning to these myriad arguments, the court will discuss the pertinent portions of the applicable statutes.

*1. The HCQIA and Alabama's peer review statutes*

When it passed the HCQIA, Congress found, in the text of the statute itself, that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42 U.S.C. § 11101(1). Congress also found that there is a "national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of their [previous incompetence]." *Id.* at § 11101(2). This problem, Congress stated, "can be remedied through effective professional peer review", and because physicians fail to engage in effective peer review because of potential money damages, they need protection. *Id.* at §

33

11101(3)-(5); *see also Bryan*, 33 F.3d at 1321-23 (discussing additional legislative history). Assuming that certain due process notice and fairness requirements are met, HCQIA immunity attaches to the physicians and the hospital. *See id.* at § 11111(a)(1).

Of particular relevance here, the HCQIA requires "health care entities" to report certain data to the NPDB. *Id.* at § 11133. The statutory definition of health care entity includes "a hospital that is licensed to provide health care services by the State in which it is located . . . ." *Id.* at § 11151(4)(A)(I). If a health care entity takes

> professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days [or] accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, [then the health care entity] shall report to the Board of Medical Examiners, in accordance with section 11134(a) . . ., the information described in paragraph (3).

42 U.S.C. § 11133(a). Section 11134(a) requires regular reporting of the information ("but not less often than monthly") and in such form and manner that the Secretary of Health and Human Services prescribes. *Id.* at 11134(a). Paragraph (3), "information to be reported," provides:

> The information to be reported under this subsection is:
> (A) the **name** of the physician or practitioner involved,
> (B) a **description** of the acts or omissions or other reasons for the action or, if known, for the surrender, and
> (C) such other information respecting the circumstances of the action or surrender as the **Secretary deems**

**appropriate**.

*Id.* at 11133(a)(3)(emphasis supplied). If the health care entity fails to comply with these requirements, amongst other repercussions, the entity loses its protection from money damages. *See id.* at 11133(c). Of note, the Secretary has issued a series of regulations, 45 C.F.R. §§ 60.1-60.14, wherein the Secretary has deemed appropriate a few more requirements, none of which relate to the substantive nature of the peer review process. *See* 45 C.F.R. 60.9(a)(3)(adding reporting requirements such as date of birth and professional license numbers).

Importantly, HCQIA immunity does not preclude equitable relief. *See id.* at § 11111(a)(1); *see also Bryan,* 33 F.3d at 1323 n.4 ((citing H.R. Rep. No. 903, 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6391); instructing that the HCQIA "does not restrict the rights of physicians who are disciplined to bring private causes of action for injunctive or declaratory relief"). There also is no private right of action for an aggrieved physician to sue peer review physicians under the HCQIA, in part, because Congress did not enact the HCQIA for the benefit of physicians. *See Bok v. Mutual Assurance, Inc.*, 119 F.3d 927 (11th Cir. 1997).

The Alabama statutes in question are §§ 22-21-8, 6-5-333, and 34-24-58, hereinafter collectively referred to as Alabama's peer review statutes. Section 22-21-8 states in pertinent part:

All accreditation, quality assurance credentialing and

35

> similar materials **shall be held in confidence** and shall
> not be subject to discovery or introduction in evidence
> in any civil action against a health care professional or
> institution arising out of matters which are the subject
> of evaluation and review for accreditation, **quality
> assurance** and similar functions, purposes, or activities.
> No person involved in preparation, evaluation or review
> of accreditation, quality assurance or similar materials
> shall be permitted or required to testify in any civil
> action as to any evidence or other matters produced or
> presented during the course of preparation, evaluation,
> or review of such materials or as to any finding,
> recommendation, evaluation, opinion, or other action of
> such accreditation, quality assurance or similar function
> or other person involved therein.

Ala. Code § 22-21-8(b) (1975)(emphasis supplied). Section 6-5-33
states in pertinent part:

> All information, interviews, reports, statements, or
> memoranda furnished to any committee as defined in this
> section, and any findings, conclusions, or
> recommendations resulting from the proceedings of such
> committee are declared to be privileged. The records and
> proceedings of any such committees shall be confidential
> and shall be used by such committee and the members
> thereof only in the exercise of the **proper functions** of
> the committee and shall not be public records **nor be
> available for court subpoena or for discovery
> proceedings**. . . .

Ala. Code § 6-5-333(d) (1975)(emphasis supplied). Assuming that
they performed in "**good faith and without malice,**" neither a peer
review committee, nor any "member thereof shall be liable for such
decision, opinion, action, or proceeding." *See* Ala. Code § 34-24-58
(1975)(emphasis supplied).

*a. Preemption*

Liu argues that the HCQIA preempts Alabama's peer review

36

statutes under the Supremacy Clause. Supremacy Clause jurisprudence is divided into three categories, namely, express preemption, field preemption, and conflict preemption. *See, e.g., Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167-68 (11th Cir. 2008)(defining each category)(citations omitted). "Congressional intent governs our determination of whether federal law preempts state law." *Boyes v. Shell Oil Products Co.*, 199 F.3d 1260 (11th Cir. 2000)(citing *Gade v. Nat'l Solid Waste Mgmt.*, 505 U.S. 88, 96, 112 S. Ct. 2374, 2381 (1992)(plurality)("The purpose of Congress is the ultimate touchstone.") Neither express nor field preemption applies here. *See Browning*, 522 F.3d at 1167-68. There is nothing in the text of the HCQIA that manifests an intent to displace state law, thus no express preemption. Further, the HCQIA is not such a pervasive scheme that it cannot tolerate a state supplement to the HCQIA law, thus no field preemption. *See id.* Rather, as discussed *supra*, Congress intended just the opposite. *See* 42 U.S.C. § 11115(a). Insofar as Liu has a colorable claim, conflict preemption provides his only possible avenue for preemption. "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the law stands as an obstacle of the federal law." *Id.* at 1167. Here, the only possible source of preemption is obstacle preemption. Obstacle preemption has been further refined as "where state law stands as an obstacle to the accomplishment and execution

of the full purposes and objectives of Congress." *This That and Other Gift and Tobacco, Inc. v. Cobb County, Ga.*, 285 F.3d 1319, 1322 (11th Cir. 2002)(internal quotation marks and citation omitted).

Liu argues that the "rationale of the HCQIA is to encourage the exchange of peer review information among credentializing authorities in different states and to immunize those who participate in peer review from civil suit." Also, he argues that the "express legislative purpose of HCQIA is . . . to discover incompetency of physicians who move from one state to another to avoid discovery of quality care issues." The court respectfully disagrees. The purpose of the HCQIA is to protect patients from medical malpractice via mandatory reporting to the NPDB, to immunize peer review committees and hospitals from damages, and to improve the quality of the nation's health care. Congress envisioned protecting physicians such as Liu to the extent of the notice and hearing requirements of § 11112(a). However, outside of these protections, the purpose of the HCQIA is not to guarantee someone in Liu's position (or to his prospective employers) access to otherwise privileged materials. Again, the persons targeted for protection are physicians engaged in peer review, and patients. Congress did not intend to require or encourage peer review committees to engage in the state-to-state, free-flowing exchange of peer review materials. If Congress had wanted to require

hospitals to provide more information to the NPDB (and/or interested third parties) than the name of the physician involved and a description of events, it could have done so. Instead, Congress left room for the Secretary to add to the requirements. The Secretary's additional requirements have been merely administrative in nature. The bottom line is that if Congress had wanted to preempt this or similar state law privileges, it could have done so.

The Alabama statutes themselves present no obstacle to the accomplishment of the Congressional purposes in the HCQIA. If Liu's flawed interpretation of the HCQIA had merit, Alabama's peer review statues would arguably frustrate the purpose of exchanging peer review files from state to state. In other words, if a physician in State "A" receives an adverse action by a peer review committee in State "A," then moves to State "B," and requests an independent peer review in State "B," Congress could have written into the HCQIA such a "second chance" for physicians. Congress chose not to do so. Instead, Congress's language and purpose expresses a conscious choice not to erode states' peer review protection. Alabama's peer review statutes only provide additional protection to peer review committees and do not preclude reporting to the NPDB or identifying physicians who may have committed malpractice. The Congressional purpose is not impeded by Alabama's peer review statutes.

b. *Alabama's peer review statutes and Federal Rule of Evidence 501*

Both Bourge and Liu move for summary judgment on Liu's claim of a violation of substantive and procedural due process rights. Liu argues that Alabama's peer review statutes do not apply in federal question cases, and urges the court to order the production of the peer review materials to USC and to Liu's other prospective employers under Fed. R. Evid. 501. Liu relies heavily on the Eleventh Circuit decision in *Adkins v. Christie*, 488 F.3d 1324, 1328 (11th Cir. 2007), *reh'g en banc denied,* 255 Fed. Appx. 498 (11th Cir. 2007), *cert. denied*, 128 S. Ct. 903, 169 L. Ed. 2d 785 (2008), discussed in detail *infra.* Liu argues that like the *Adkins* court, this court should find that Fed. R. Evid. 501 precludes the application of Alabama's peer review statutes and that "since *Adkins* refused to permit the medical peer review privilege to shield the discovery in litigation of peer review information, it follows that the privilege cannot be used to shield disclosure to sister state credentializing authorities." This is a non-sequitur. There is a material difference between a rule of evidence applicable in court proceedings and a right of access to that same evidentiary material outside court proceedings. Fed. R. Evid. 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall

be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

In interpreting this rule, the Eleventh Circuit has instructed that "[t]he Federal Rules of Evidence empower the federal courts to 'continue the evolutionary development of [evidentiary] privileges.'" *Adkins*, 488 F.3d at 1328 (quoting *Trammel v. United States*, 455 U.S. 40, 47, 100 S. Ct. 906, 910 (1980))(alteration in original). "However, these privileges remain disfavored and should not be lightly created." *Id.* (citation omitted). "Inasmuch as testimonial [ . . . ] privileges contravene the fundamental principle that the public . . . has a right to every man's evidence, any such privilege must be strictly construed." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189, 110 S. Ct. 577, 582 (1990)(second alteration in original)(internal quotation marks and citations omitted). "Accordingly, there is a presumption against privileges which may only be overcome when it would achieve a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Adkins*, 488 F.3d at 1328 (internal quotation marks and citation omitted). Liu is correct in contending that state law privilege does not necessarily apply in federal question cases. *See* Fed. R. Evid. 501, Conference Report;

*see also Adkins*, 488 F.3d at 1324. It does not follow that if the privilege is not available under Fed. R. Evid. 501, in a court proceeding, the court must order the production of the evidence to out of state peer-review authorities.

In *Adkins*, the plaintiff-physician, Adkins, a black male, sued his former employer and several peer review physicians under 42 U.S.C. §§ 1983 and 1981 for racial discrimination arising out of a peer review process that resulted in his suspension and eventual termination. *See Adkins*, 488 F.3d at 1324. Adkins, a newly hired physician at Houston Medical Center ("HMC"), was given provisional status at HMC for one year in accordance with HMC's bylaws. However, HMC extended Adkins's provisional status for six months based on his  "alleged[ ] fail[ure] to follow protocols for pre-admission of surgical patients, fail[ure] to complete medical records in a timely manner, and [ ] problems with availability for call." *Id.* at 1326.  In addition, Adkins claimed that despite his good record, HMC placed "additional conditions" on his employment. Adkins also alleged that "HMC deliberately mishandled the care of one of his patients [ ] and later used that case as a pretext to take action against him." *Id.* at 1326. HMC disputed these claims, based in part on Georgia's peer review privilege. The district court concluded that the privilege applied in federal civil rights actions, yet ordered HMC to provide Adkins with "descriptions of all incidents giving rise to peer review without disclosing the

42

documents themselves." *Id.* at 1327.   The trial court allowed limited discovery of HMC peer review documents covering *other* physicians it deemed to be "similarly situated" to Adkins. *Id.* at 1328. After an in-camera review of this other material, the district court granted summary judgment to HMC. The Eleventh Circuit refused to apply Georgia's medical peer review privilege and accordingly vacated and remanded the case for the discovery of Adkins's peer review material. The *Adkins* court balanced the factors set forth in *Jaffe v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923 (1996). The *Jaffee* factors include: "1) the needs of the public good; 2) whether the privilege is rooted in the imperative need for confidence and trust; 3) the evidentiary benefit of the denial of the privilege; and 4) consensus among the states." *Id.* at 1328 (quoting *Jaffee*, 518 U.S. at 10-16, 116 S. Ct. at 1928-31). The *Adkins* court agreed with HMC's arguments that confidential peer review served important interests such as vigorous oversight, thus supporting the "public good" factor. *Id.* at 1328. It likewise agreed that there is a consensus among the states, in fact, that all fifty states recognize such a privilege. *Id.* at 1330. However, the court held that in light of the principles disfavoring recognition of new privileges and balanced with the "corresponding and overriding goal [of] discovery of evidence essential to determining whether there has been discrimination in employment," Georgia's medical peer review privilege did not apply. *Id.* at 1328-

29. The *Adkins* court emphasized that "[h]ere we are confronted with a claim of racial discrimination within the peer review process itself, implicating the important social goal of eliminating employment discrimination." *Id.* at 1329 (citation omitted). The most obvious distinction between Adkins and Liu is that Liu is not claiming discrimination. He is only seeking third-party access to materials privileged under Alabama state law.

The court will not expansively extend the reasoning of *Adkins* to cover Liu's circumstances. Liu is not alleging wrongful discrimination. Liu has not cited, nor has the court found, any decision extending the *Adkins* reasoning to circumstances like these. Liu avers that "since *Adkins* refused to permit the peer review privilege to shield the discovery in litigation of peer review documents, it follows that the privilege cannot be used to shield disclosure to sister state credentializing authorities." As previously stated, this reasoning is flawed. There is a fundamental difference in "purpose" here. Adkins's purported purpose was to prove intentional discrimination as the cause of HMC's adverse peer review action. Liu seeks to prove that Bourge's actions were a violation of due process because Bourge intended to prohibit him from engaging in his chosen profession. Assuming that the *Jaffee* factors apply here, the same factors that supported HMC support Bourge. However, the same factors that supported Adkins do not support Liu. Liu is not asking for the documentation to prove

44

anything to this court. Instead, he wants to begin a "second chance" proceeding out of state, and arguably as many chances *ad infinitum* with as many different peer review committees as he needs or wants. In reality, he seeks to represent USC, a non-party. Setting aside the troublesome administrative issues such an expansive rule would create, this court finds that, unlike *Adkins*, there is no overriding social goal calling for the opening of this Pandora's box. Whereas in *Adkins,* the added important social goal was eliminating employment discrimination, allowing aggrieved physicians who failed to avail themselves of peer review proceedings (possibly ignoring the advice of counsel) to return later and demand another proceeding in another state is not a goal that calls for a sea change in the law. If Liu had participated fully in UAB's peer review process, rather than making an informed decision to resign from UAB, there might be a basis for arguing that the Alabama peer review privilege does not apply, but such an argument is not available to Liu. Despite the disfavoring of privileges, the court finds that Alabama's peer review privilege applies here and was properly and reasonably invoked by Bourge. Assuming that Alabama's peer review statutes do not apply in a federal court proceeding, and that the *Adkins* reasoning can be extended to Liu, the court has another reason for ruling for Bourge, namely, that Liu failed to demonstrate that Bourge violated any federal right, a matter to be discussed *infra.*

45

Liu tries to stay alive by relying upon a "need to know" rule of confidentiality, and by claiming bad faith and/or malice by Bourge. The Alabama Supreme Court has never recognized a "need to know" exception to the privilege attaching to peer review materials. In interpreting § 22-21-8, the Alabama Court has held that the purpose of full candor in the peer review proceedings is only advanced if "all documents" considered during the process are protected in order to encourage self-regulation by the medical profession. *Ex parte Krothapalli*, 762 So. 2d 836, 839 (Ala. 2000)(citations and internal quotations omitted). Additionally, the Alabama Court in *Kingsley v. Sachitano*, 783 So. 2d 824 (Ala. 2000), addressed a situation not unlike the instant case. Kingsley, a vascular surgeon, sued three other physicians for various torts, including negligence and wantonness in a peer review decision. *Id.* When Kingsley subpoenaed the peer review documents from the hospital, the hospital objected, exercising its privilege under § 22-21-8. *Id.* at 825. The trial court agreed with the objection and quashed the subpoena. *Id.* The trial court reasoned that based on the plain meaning of Alabama's peer review statutes, without evidence of bad faith or malice, the peer review documents were privileged. *Id.* The Alabama Court affirmed, holding that the trial court had not abused its discretion, reasoning that the sweeping language of § 22-21-8 required the protection. *Id.* at 828.

Liu maintains that *Ex parte Cryer*, 814 So. 2d 239 (Ala. 2001),

46

stands for the proposition that "materials protected by § 22-21-8 are limited to those prepared by a 'hospital, clinic, or medical staff'", and that documents prepared outside of those circumstances are available for release to out of state peer review authorities. Liu's Response to Defendants' Motions to Dismiss at 12. In *Cryer*, a doctor's handwritten notes prepared for a meeting with physician shareholders were found not to be privileged, in a suit later for malpractice. *Id.* Liu reads *Cryer* too broadly. The Alabama Court was careful to point out that the "statements at issue in this case did not constitute part of a peer-review process" and for that reason were not discoverable. *Id.* at 246.

Here, Liu is correct in arguing that Alabama's peer review statutes apply primarily to litigation. However, their sweeping language, "held in confidence . . . [not] available for court subpoena" coupled with the purpose of maintaining the confidentiality of "all documents," demonstrates that the Alabama legislature intended an almost hermetically sealed status for all peer review documents. Liu also misreads *Cryer*, which actually strengthens the legislative lock on peer review documents. To create an exception on a "need to know" basis, sanctioning the disclosure to peer review authorities out of state, would erode the plain meaning, purpose of the statutes, and their interpretation by the Alabama Supreme Court. Such an exception would effectively rewrite the Alabama statutes.

47

The court does not find Liu's allegations of bad faith or malice to be supported by the evidence. Even viewing actions of Bourge and inferences to be drawn from them in a light most favorable to Liu, the court cannot conclude that any evidence exists upon which a jury could reasonably find that Bourge acted in bad faith or with malice. Bourge was not even on the peer review group, and he only invoked Alabama's privilege that this court finds a legitimate one. How can a person be guilty of violating the law for following the law? Hospitals have an obvious interest in ensuring that their staff physicians conduct themselves in an ethical and professional manner. *See, e.g., Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir. 2003)("'Quality health care' is not limited to clinical competence, but includes matters of general behavior and ethical conduct."). It is not the function of this court to determine the frequency with which physicians must visit their patients, the appropriate time of day or night to operate (or to not operate), or more generally, to begin taking sides on the appropriate standard of care. Liu's difficulties with Bourge and Chapman are those of general behavior and clinical competence, well within the purview of Bourge's authority and responsibility. This, coupled with the PCTA/PCI bypass and hematoma issues, demonstrates that Bourge's decision to place Liu on probation and his decision to refer Liu to peer review was no more in bad faith or malicious than his decision not to

release the peer review materials to USC. Bourge's actions were well within the discretion he was granted by UAB's bylaws. The fact that the non-UAB reviewer selected by Liu said that "he would have done some things differently" does not change the law. It is only his opinion. Likewise, if this court were authorized to make a *de novo* finding of what discipline, if any, should have been administered to Liu, the court might have reprimanded and admonished him, warned him to get along better with his peers, advised him to visit patients each day as instructed, and told him not to angrily tell his new boss that he did not approve of his selection. Likewise, the court might have advised Liu to participate fully in the peer review process. The court might also have suggested that both he and Bourge take the Dale Carnegie course. However, the court was not awarded such an advisory role. The court is only required to determine whether Liu has presented sufficient facts to overcome Bourge's motion for summary judgment. Viewing all of Bourge's actions in a light most favorable to Liu, the court cannot find an evidentiary basis for a finding that Bourge acted in bad faith or with malice. There is simply no basis for circumventing  Alabama's peer review statutes. They provide Bourge another layer of protection under these circumstances from a § 1983 claim.

*c. Substantive and Procedural Due Process and Equal Protection*

Section 1983 requires Liu to demonstrate the violation of a

federal right. Liu's conclusory allegation that his substantive due process rights were violated are without colorable merit. Liu cites *Cleveland Bd. Of Educ. v. LaFleur*, 414 U.S. 632 (1974), for the proposition when a state creates a conclusive presumption that a person cannot perform his or her chosen profession, the state action is a violation of substantive due process. The court cannot see how Bourge, in his official capacity, acting for the state, could have created such a presumption applicable to Liu and all similarly situated individuals. In *LaFleur*, the Court struck down certain school board rules that violated the due process clause. *Id.* The rules required pregnant teachers to take five to six months of maternity leave. *Id.* The rules violated the due process clause only because they created the conclusive presumption that a woman who was five to six months pregnant is incapable of continuing in her job. *See id.* Bourge points to *Boyett v. Troy State Univ.*, 971 F. Supp. 1403 (M.D. Ala. 1997), where a professor sued a state university for failing to reappoint him. In *Boyett*, the deciding court failed to recognize any substantive due process right, because, *inter alia*, the professor failed to present any evidence that he was precluded from "pursuing his profession with all employers." *Id.* at 1414. *LaFleur's* reasoning is not applicable. *Boyett's* reasoning fits perfectly. No conclusive presumption arises from anything that Bourge did or did not do. There is no conclusive presumption that Liu cannot perform interventional cardiology. In

fact, he is currently employed by several hospitals. And, assuming that the profession of "teaching physician" is a profession separate from physician, Liu testified that USC would consider hiring him if he worked in private practice for one year. *Boyett* applies in that Liu has clearly not been prevented from employment with "all employers." He has at least two clinically privileged positions. The record does not reflect that he has ever applied for a teaching position at any educational institution other than USC. Liu simply has no substantive due process claim.

Liu also claims that Bourge was deprived him of procedural due process. In order to prevail on a procedural due process claim, a plaintiff must first demonstrate the existence of a property or liberty interest. Liu fails to cite any case for the proposition that he has been deprived of either of these interests, much less that he was so deprived by the HCQIA or by Bourge's reliance on Alabama's peer review statutes. Property interests are defined by state law. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 548 (1972). And Liu has not pointed to any state law giving him, or, vicariously USC, a property right in the disputed peer review materials. In fact, Alabama's peer review statues are diametrically opposed to his assertion. As discussed *supra*, the bad faith exception provides Liu no shelter. Nor has Liu demonstrated a liberty interest. Assuming only for the sake of argument that a right to pursue one's chosen profession can

constitute a liberty or property interest, there is no proof of loss.

Liu alleges that his right to equal protection was violated because the HCQIA and/or Alabama's peer review statutes are unconstitutional as applied to him. This claim is also without merit. Because neither the Alabama statutes nor the federal statute "burdens a fundamental right nor targets a suspect class" each is constitutional "so long as it bears a rational relationship to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996). Physicians and/or teaching physicians are not members of a suspect class. Both statutes bear a rational relationship to the legitimate interest of preventing spurious medical malpractice lawsuits, encouraging rigorous peer review, and protecting patients. Liu is not a member of a suspect class, and there was a rational basis for Bourge's actions, particularly in light of the purposes of the pertinent statutes. Accordingly, Liu's equal protection claim is due to be dismissed.

Viewing the facts in a light most favorable to Liu, there is no set of facts upon which a reasonable jury could find that Liu has been deprived of any federal right for the pursuit of any § 1983 claim.

*E. State Law Claims*

The court can only assume jurisdiction over Liu's state law

claims by an exercise of its supplemental jurisdiction under 28 U.S.C. § 1367(a). Because Liu's federal question claims are being dismissed, the court's jurisdiction over Liu's state law claims is purely discretionary. 28 U.S.C. § 1367(c)(3)("The district courts may decline to exercise supplemental jurisdiction over a claim under [§ 1367(a)] if . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Pintando*, 501 F.3d at 1241. The court declines jurisdiction over the state claims and will dismiss them without prejudice.

### *V. Conclusion*

The Board's motion for summary judgment will be granted. Bourge's motion for summary judgment will be granted. Liu's motion for partial summary judgment will be denied.

DONE this 15th day of December, 2008.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE